

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/30/07

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

RECEIVED
OCT 29 2007
CHAMBERS OF
JUDGE ROBERT P. PATTERSON

October 29, 2007

MEMO ENDORSED

By Hand Delivery

The Honorable Robert P. Patterson
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   United States v. Hugh Gray, et al., S3 07 Cr. 971 (RPP)

Dear Judge Patterson:

    A bail hearing for defendant Lloyd Reid, a/k/a "Kevin," is scheduled in the above-referenced matter for Tuesday, October 30, at 12:00 p.m. The Government is appealing the determination of The Honorable Kevin N. Fox, United States Magistrate Judge, ordering the release of Reid on bail conditions including a $150,000 bond, co-signed by four financially responsible persons, the posting of $10,000 in cash or property as security, travel restricted to the Southern and Eastern Districts of New York, the surrender of any travel documents with no new applications for travel documents permitted, home detention with electronic monitoring, and strict pretrial supervision, including drug testing. Judge Fox made this determination on Friday, October 26, and required that all conditions be met prior to the defendant's release. The conditions have not yet been met and the defendant remains in custody at this time.

    As the Government argued before Judge Fox, it is the Government's position that there are no conditions sufficient to assure both Reid's appearance in Court and the safety of the community, and therefore the defendant should be detained. See 18 U.S.C. § 3142(e). As this Court is aware, the factors relevant to such a determination include the nature and circumstances of the offense charged, the weight of the evidence, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community posed by the defendant's release. See 18 U.S.C. § 3142(g). Where the Court finds that there is probable cause to believe that the defendant committed an offense for which a maximum term of imprisonment of ten years or more is prescribed by the Controlled Substances Act, a rebuttable presumption arises that no condition or combinations of conditions will reasonably assure the appearance of the person and the safety of the community. See 18 U.S.C. § 3142(e).

    Here, the rebuttable presumption arises because the defendant has been indicted by a

*[handwritten endorsement:]* Appeal Denied for the reasons stated on the record on October 30, 2007. So ordered. 10/30/07 Robert P. Patterson

grand jury for participation in a conspiracy to distribute at least 1,000 kilograms of marijuana, which carries a mandatory minimum sentence of ten years' imprisonment and a maximum sentence of life imprisonment. See 21 U.S.C. §§ 846, 841(b)(1)(A), 812.

### I. Risk of Flight

The Government respectfully submits that the defendant is a risk of flight in light of the lengthy mandatory minimum term that he is facing and the strength of the Government's case. The Government has seized over four hundred pounds of marijuana and over $1 million in narcotics proceeds or narcotics-related monies in connection with this investigation. The evidence of this defendant's participation in the charged conspiracy includes approximately five months of court-authorized Title III wire intercepts, including over two months of interceptions of this defendant's phones. The intercepted calls reveal not only that the defendant participated in the charged conspiracy including by purchasing marijuana from co-conspirators and supplying it to others, but also that the defendant had a leadership role in the organization. For example, in an intercepted call that is attached hereto as Exhibit A, that took place on August 1, 2007, between the defendant and an unidentified male known as "Daddy," the defendant explained that the defendant expected to receive a "cut" of the proceeds of marijuana sales and/or marijuana purchased by of his co-conspirators. The defendant is asked, "how are you and the men?" and he responds, "which men, Pretty?" [a reference to co-defendant Peter Brown, a/k/a "Pretty"]. The defendant then went on to explain that:

> "I'm letting them know that right now, what they're going to have to do. I can't take when they want me to deal with something, they're coming to give me what they want to give me. So I'm letting them know that anytime they're going to the 'market' every time they go they have to have something for me on the boat, plus what I'm going to give them my money to buy. . . . Because they're paying tax, you know . . . they're paying tax to some other man, so I don't know why they thing that they think I'm an idiot. I'm letting them know right now that every time they go to the 'market' I want something. Plus what I'm going to give them my money to buy."

Based on the agents' training and experience, as well as their participation in this investigation, it is the Government's position that on this call, the defendant explained that he expects to receive from his co-conspirators not only the marijuana that they purchase for him – referred to as "what I'm going to give them my money to buy" – but also an additional cut, an additional portion of either marijuana that they purchase or the proceeds of their marijuana sales. These statements reflect the defendant's leadership role in the organization.

In addition to this and other intercepted calls, the defendant made post-arrest statements in which he acknowledged both his role as a marijuana dealer and his leadership status in the organization. For example, the defendant acknowledged that he was called upon to resolve disputes among co-conspirators involving, for example, the payment of narcotics-related debts,

and also to act as a point of contact between the New York branch of the organization and some of the organization's leadership in Jamaica.

As a result of the above-referenced evidence, which is only a portion of the evidence against the defendant in this case, it is the Government's position that both the strength of its case and lengthy mandatory minimum term render this defendant a flight risk, despite his substantial ties to the New York area that are outlined in the pre-trial services report. In addition, because the defendant has no criminal history, and is only twenty-nine years old, the prospect of such a lengthy mandatory minimum term of incarceration is particularly significant, and contributes to the risk that this defendant may flee to avoid prosecution.

## II.   Danger to the Community

The Government also respectfully submits that the defendant is a danger to the community, and that no conditions – including home detention with electronic monitoring – are sufficient to assure the safety of the community if this defendant is released. While the indictment does not yet charge the defendant with using a firearm in connection with his drug-trafficking activity, or with acts of violence in relation thereto, there is substantial evidence both of the defendant's prior acts of violence, his willingness to use violence in connection with his drug-trafficking activity, and his use of a firearm in connection therewith.

First, the defendant's post-arrest statements, intercepted telephone calls, and statements of a confidential informant who has provided reliable information in the past reflect that this defendant typically carries a firearm. The defendant admitted in his post-arrest statement that he had owned a firearm in the past. That statement corroborates an intercepted telephone call on or about July 31, 2007, in which the defendant, speaking to an unidentified male, commented that a particular neighborhood is "hot," meaning dangerous, that the defendant has his "thing," believed to be a reference to a gun, and that he "can't leave it in these times" because he's been "carrying it since the other day." A summary of this call – the full transcript is not yet available – is attached here to as Exhibit B. The Government also learned from conversations with a confidential informant who has observed the defendant that the defendant typically carries a firearm.

Second, the defendant has stated on an intercepted telephone call that he has killed people in the past. In that call, attached hereto as Exhibit C, the defendant stated to an individual who is not at this time believed to be involved in the conspiracy,: "it's a lot of bulls - - - that I used to do I just stopped now that I am older and realized that I have to let go of certain things. I tapped up a lot of Niggaz B." Based on the agents' training and experience, and participation in this investigation, the Government understands the phrase "tapped up" to mean "killed." While the defendant suggested on the call that he engaged in such conduct when he was younger, in light of the fact that he is only twenty-nine years old, such conduct almost certainly occurred in the recent past.

Third, and most significantly, as recently as August 17, 2007, the defendant stated in an intercepted call, attached hereto as Exhibit D, that he was planning to use violence against people in order to steal either their marijuana, money, or both. Speaking to an unidentified female known as "Renee" the defendant stated that he thought he was "going to start to get on some really crazy [expletive]." When asked what he meant, the defendant responded "I won't tell you. I just feel like that's what I'm going to start doing, you'll see. . . . I'm going to start to take away some people and stand up and take away their things, you'll see." When asked if he would do this in Jamaica – where the leadership of this narcotics organization is based – or in America, the defendant responded:"what's the difference with Jamaica or America? People can't get tied up in America?" The defendant went on to say:

> "from the other day I've just been getting this easy spirit. I just don't care. That's why I don't want to grab anybody and get a little bit. You grab somebody and get some decent food, they should see you and be afraid of you, you'll kill them for their own thing."

Based on their training and experience, and participation in this investigation, agents are familiar with the use of the term "food" as a reference to either marijuana or money. The Government respectfully submits that the defendant's statement that he would tie up and kill people for their "food," and that people should be afraid of him, particularly in light of the evidence that he carries a gun and thus has the means to make good on his threat, is clear and convincing evidence that he poses a danger to the community and should be detained.

When the Government offered these calls at the bail proceeding before Judge Fox, the defense counsel responded that the Court was essentially limited to the charges in the indictment in evaluating whether the defendant posed a danger to the community. Defense counsel pointed out that the indictment did not charge the defendant with using a firearm in connection with a drug-trafficking offense, or with any of the threats or conduct reflected in the intercepted calls. However, Second Circuit law is clear that this Court is not limited to the charges in the indictment in evaluating the dangerousness of a defendant for purposes of detention.

In United States v. Rodriguez, 950 F.2d 85 (2d Cir. 1991), attached as Exhibit E hereto, the Second Circuit held that facts supporting a finding of dangerous must be supported by clear and convincing evidence and that the Government retains the burden of proving dangerousness even where, as here, the statutory presumption has been invoked. See id. at 88. The Second Circuit rejected as legal error the district court's requirement that the violent conduct be connected to, much less charged in, the indictment. The Court clearly stated "we have never required such a nexus, nor do we impose such a requirement today. The issue is whether a defendant poses a danger to the community. [A shooting may be] . . . probative of dangerousness, regardless of whether the incident was related to drug trafficking." See id. In Rodriguez, the Government's evidence of dangerousness was that the defendant Rodriguez had been described to an undercover agent in a taped conversation as "a hitman," that the defendant Rodriguez had referred to a murder that he had committed in the past during a taped meeting, and that a

confidential informant had said that he had observed Rodriguez shoot an individual in the kneecap over a $60 debt. See id. at 87-88.

In light of the Rodriguez decision and the evidence set forth above, it is the Government's position that the fact that the defendant is not charged in the indictment with the conduct evidenced by the defendant's statements on the calls, or with using a gun in connection with a drug-trafficking offense, in no way reduces the danger to the community that the defendant presents.[1] The defendant's own statements that he has murdered people in the past and that he would be willing to "kill" for "food" – a well-known reference to either money or marijuana in this context – in addition to the evidence that he carries a firearm, as supported by both the defendant's own admission and information provided by a confidential informant, can and should be considered by this Court as clear and convincing evidence that the defendant is a danger to the community.

For the reasons set forth above, it is the Government's position that the defendant is both a risk of flight and a danger to the community, and should be detained pending trial in this case.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By: _____
Jocelyn E. Strauber
Assistant United States Attorney
(212) 637-1034 (phone)
(212) 637-0086 (fax)

cc:   Jeremy Schneider, Esq. (By facsimile)

---

[1] Furthermore, the fact that the defendant lacks a criminal history is not dispositive of the dangerousness inquiry. Although such a record "eases the Government's burden of showing dangerousness, it is not essential." If the Government has proved dangerous by clear and convincing evidence, no more is required for detention. See Rodriguez, 950 F.2d at 88-89.